1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

11

MARTY GLEN ALLEN,                          1:07-cv-01751 DLB (HC)

               Petitioner,        ORDER DENYING PETITION FOR WRIT OF
12                                         HABEAS CORPUS, DIRECTING CLERK OF
                                           COURT TO ENTER JUDGMENT IN FAVOR
   v.                                  OF RESPONDENT, AND DECLINING TO
13                                         ISSUE CERTIFICATE OF APPEALABILITY

14   J. WALKER,
                                           [Doc. 1]
15                 Respondent.
                                 /

16

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to

19   the jurisdiction of the United States Magistrate Judge.

20                                   PROCEDURAL HISTORY

21          An amended information was filed on June 17, 2005, in the California Superior Court for

22   the County of Tulare, charging Petitioner with the following four offenses: count 1-first degree

23   residential burglary (Cal. Penal Code § 459[1]); count 2-felony vandalism (§ 594); count 3-

24   misdemeanor vandalism (§ 594); and count 4-misdemeanor disturbing the peace (§ 415).  (CT[2]

25   77-81.)  It was also alleged that Petitioner suffered prior convictions within the meaning of

26

27          [1] All further statutory references are to the California Penal Code, unless otherwise indicated.

28          [2] "CT" refers to the Clerk's Transcript On Appeal;  "RT" refers to the Reporter's Transcript On Appeal;
and "SCT" refers to Supplemental Clerk's Transcript On Appeal.

1  section 1170.12, subdivision (c)(2)(A), and allegations of prior serious felonies under section

2  667(a)(1).  (Id.)

3          Following jury trial, Petitioner was convicted on all counts.  In a bifurcated hearing, the

4  trial court found the priors true.  (I CT 194.)  On August 30, 2005, Petitioner was sentenced to a

5  total term of twenty-five years to life, plus ten years.  (I CT 225-226, 234-235; 9 CT 700.)

6  Counts Two and Four were dismissed, and no sentence was imposed on Count Three.  (RT 699-

7  700.)

8          Petitioner filed a timely notice of appeal to the California Court of Appeal, Fifth

9  Appellate District.  (Lodged Doc. No. 1.)  The Fifth District Court of Appeal affirmed the

10  judgment on September 29, 2006.  (Lodged Doc. No. 4.)

11          Petitioner then filed a petition for review in the California Supreme Court, which was

12  denied on December 13, 2006.  (Lodged Doc. Nos. 5, 6.)

13          In the interim, Petitioner filed a petition for writ of habeas corpus in the California

14  Supreme Court on November 15, 2006.  (Lodged Doc.  No. 7.)  The petition was denied on May

15  23, 2007.  (Lodged Doc. No. 8.)  While the November 15, 2006, petition was pending, Petitioner

16  filed a second petition for writ of habeas corpus in the California Supreme Court on December

17  18, 2006.  (Lodged Doc. No. 9.)  That petition was also denied on May 23, 2007.  (Lodged Doc.

18  No. 10.)

19          Petitioner initially filed the instant petition for writ of habeas corpus on December 3,

20  2007.  (Court Doc. 1.)  Respondent filed an answer to the petition on April 17, 2008, and

21  Petitioner filed a traverse on June 16, 2008.  (Court Docs. 23, 31.)

22                              STATEMENT OF FACTS

23          Brenda Shook testified that Petitioner was her boyfriend and she had been dating him for

24  approximately two years.  (RT 53-54, 159-160.)  At the time the two meet, Brenda was living

25  with Belinda Sue Anderson at 611 S. Edison.  (RT 56-57.)  At one point in time, Petitioner

26  moved into the residence and assisted in paying expenses.  (RT 55-58, 75, 193, 230-232.)  In

27  August of 2004, Brenda broke off her relationship with Petitioner and began dating another man

28  for a short period of time.  (RT 60-61.)

Brenda denied that Petitioner had ever hit or threatened her and denied that she ever told anyone he had done so; however, she acknowledged that the two engaged in "normal arguments." (RT 64-65.)  To the contrary, Belinda testified that Brenda and Petitioner did not have a healthy relationship and fought all the time.

In August of 2004, after Petitioner and Brenda had broken up and she had changed her telephone number, Petitioner wrote her new telephone number on the windshield of her car. (RT 62-71, 142.)  Brenda was able to wipe the writing off with soap and an abrasive pad.  (RT 203-204.)  Brenda denied that Petitioner yelled and cursed at her; she acknowledged, however, that she called the police the previous night because Petitioner would not leave her alone.  (RT 63-64.)  In addition, Brenda denied that Petitioner threatened to beat or burn her car or that she expressed fear of him to police.  (RT 64-65.)  Belinda testified that Petitioner threatened to beat Brenda and the two were yelling at one another.  (RT 240, 290-292.)

A short time after the incident in August, Brenda and Petitioner resumed dating.  (RT 72.)  On September 14, 2004, Petitioner went to Brenda's residence and asked for a ride.  When Brenda refused, Petitioner got angry and removed the fuses from her vehicle.  (RT 73.)  Brenda called the police.  (Id.)  At approximately 7:30 that evening, while Belinda was home in the residence, she saw Petitioner break a window in the living room and found a rock lying on the floor.  (RT 244-245, 249.)  Belinda telephoned Brenda, who went to the residence and observed the broken window.  (RT 76-77, 251-252.)  Brenda also found a hat that she had given Petitioner and he had worn earlier that day, inside the residence.  (RT 78-79.)  The police responded a short time later to investigate the vandalism.  (RT 450-451.)

Belinda left the residence at approximately 10:30 p.m. that evening and went to stay the night at a friend's house.  Later that evening, Brenda went to the Blitz Bar to talk to Petitioner and ask him why he had broke the window.  Brenda left between 11:30 and 12:00 and stayed the night at her ex-husband's house.  (RT 81-84, 179.)

At approximately 3:30 a.m. on September 15, Brenda received a telephone call from Petitioner, who was unhappy because she was not at home.  (RT 84, 87.)  Brenda stated that she did not remember telling an officer that Petitioner told her she had "better get home or else [she]

3

wouldn't have any doors to get through." (RT 85-86.)  When Brenda arrived home later that

morning, she discovered that the house had been vandalized.  (RT 84, 88-104.)  She called both

the police and Belinda.  (RT 252-253.)  Several messages from Petitioner were discovered on the

answering machine, which were played for the jury.  (RT 280-281.)  In particular, one message

stated:

> tell Brenda she's got exactly seven fucking minutes or I'm gonna be at her door.
> She needs to get to the Blitz in seven fucking minutes.  Me and Chris will be at
> her fucking door and your ass will be drug around like the whore you really are.

(RT 281; SCT 3.)

Several items in the house were overturned and damaged including two broken mirrors,

scattered shower door, broken table leg and scratches to the chairs, and a broken vase and other

figurines.  (RT 90-103, 257-264, 267-275.)  The owner of the home stated that she paid $3,700 to

repair the damage done by the September vandalism.  (RT 297-300.)  The insurance adjuster

inspected the property and noticed damage to the blinds, broken windows and shower door,

damaged linoleum, and substantial damage to the interior and exterior doors.  (RT 307.)  The

estimated cost to repair the damage was $14,012.49. (RT 309.)

Visalia Police Officer Kevin Kroeze responded to the residence and spoke with Brenda.

(RT 434.)  Kroeze had seen Petitioner at the Blitz Bar the previous evening and noticed fresh

lacerations on his hands.  (RT 437-438.)  Brenda acknowledged that she was angry at Petitioner

after the vandalism and told police he had done it.  (RT 192.)

Belinda testified that Brenda reported that Petitioner had previously hit her to the point of

unconscious.  She also indicated that she was staying with Petitioner because she was afraid of

him and it was easier to deal with.  (RT 233-234.)  In fact, Brenda continued to stay in a

relationship with Petitioner after the September vandalism, and she considered herself to be his

girlfriend and did not favor his prosecution.  (RT 111, 161.)   Brenda did not show up for several

schedule meetings with District Attorney investigator Sharon Mizner, and she was angry when

served with a subpoena.  (RT 334-335, 338.)

In response to questioning by defense counsel, Brenda indicated that on September 14,

Eric Ward, with whom Belinda had been dating, stopped by the residence looking for her.  (RT

4

1    182.)  Brenda told Eric that Belinda was not home and he was angry.  (RT 181-183, 186.)

2        Prior Acts/Section1101 Evidence

3        In December 2004, Brenda decided to move out of the residence she shared with Belinda.

4    (RT 283-285.)  That month, Belinda received a threatening message on her answering machine

5    from Petitioner which was played for jury.  (RT 282, 286; SCT 004.)

6        Brenda moved out of the residence sometime around Christmas of 2004 and moved to

7    615 West Noble.  (RT 108-109.)  In April or May of 2005, Brenda began dating Brian Carlsen;

8    however, she still talked to Petitioner.  Carlsen stayed at the residence with Brenda.  (RT 110-

9    111.)  On one occasion Petitioner went to the residence while Carlsen was there, and the two

10   engaged in a fight.  (RT 112.)  Petitioner bit Carlsen during the fight.  (RT 128.)

11       At approximately 4:15 a.m. on April 1, 2005, Petitioner was outside Brenda's residence,

12   yelling and screaming calling her a "bitch" and "whore."  The police responded and Brenda

13   indicated that one of the bedroom windows was broken.  (RT 113-115.)  She testified that she did

14   not see Petitioner do anything to Carlsen's truck; however, she acknowledged that she saw

15   someone crouching down by his truck but did not know who it was.  She did not deny that she

16   may have told the police that it was Petitioner she saw by Carlsen's truck.  (RT 116-117.)  The

17   tire to Carlsen's truck had been slashed.  (RT 112-120, 487-489, 494-495, 498-500.)

18       Later that afternoon or early evening on April 1st, Petitioner went to Brenda's home.  She

19   answered the door and told him to leave because Carlsen was there.  When she told Carlsen that

20   Petitioner was at the front door, Carlsen started a fight with Petitioner, and Brenda called 911.

21   (RT 112, 121-131, 145, 219-222.)  When Officer Diltz arrived, Brenda told him that Petitioner

22   was banging on the door, screaming at her, and attempted to gain entry.  She told Diltz that

23   Petitioner charged at Carlsen.  (RT 489-491.)  While officer Diltz was present, he listened to

24   several messages on the answering machine which included threats to Carlsen and reference to

25   Brenda as a bitch or whore.  (RT 493-494.)

26       A few days later, on April 8, 2005, at approximately 12:37 a.m., officer Verissimo

27   responded to Brenda's residence, who indicated that the motion detector had gone off.  Brenda

28   told the officer that Petitioner smashed the windows of Carlsen's truck and used a knife to slash

his rear tire.  (RT 133-138, 169, 173-174, 211, 217, 502-505.)  It was apparent that Petitioner had

vandalized Carlsen's truck.  (RT 136-137, 145, 486-487.)  The damage included dents to the

exterior, damage to the interior driver's door and the tires were slashed with a knife.  (RT 470-

473.)

On April 9, 2005, at approximately 4:30 a.m., officer Verissimo responded to the

residence again.  Brenda indicated that she observed Petitioner smash the motion detector and

break the window in her vehicle. (RT 138-142, 145, 211, 218, 505-506.)

The jury heard the telephone calls between Petitioner and Brenda while he was in

custody.  Petitioner told Brenda to testify that she made a mistake, to which she agreed.  (SCT

23-49.)  Petitioner indicated that Belinda had implicated him in the burglary/vandalism incident

and stated that he left his hat there.  (SCT 25.)  Petitioner denied the incident indicating that he

had an alibi.  (SCT 36.)  The two also conversed about how Brenda should testify regarding the

April 2005 incident involving Carlsen.  (SCT 46-47.)

Defense Case

Matthew Crenshaw, received several telephone calls from Petitioner during the period of

June 15 and July 10, 2005, the time he was in jail.  (RT 514.)  Petitioner also wrote several letters

to Crenshaw concerning his case.  Crenshaw acknowledged that he knew Brenda and she told

him she did not want to testify against Petitioner.  (RT 526-527, 532.)  Crenshaw denied any plan

to provide Petitioner with an alibi defense.  (RT 533.)  The tape recordings of the telephone

conversations between Petitioner and Crenshaw were played for the jury.  (RT 550-551; SCT 6-

12.)

Mr. Crenshaw testified that on the evening of September 14, 2004, Petitioner telephoned

him and asked for a ride.  He went to the Blitz Bar at approximately 11:30 p.m. and picked up

Petitioner.  Petitioner was drunk and the two went back to Crenshaw's house.  After

approximately 30 minutes, Petitioner passed out.  Crenshaw stated that he was still there at about

11:00 a.m. the next morning.  (RT 536, 539, 542-545, 547-548.)

Brenda indicated that after the vandalism incident in September 2004, she saw Eric Ward

wearing the Harley Davidson hat she had purchased for Petitioner, the same hat that was located

6

1   in the house just after the burglary and vandalism.  (RT 566-567.)  She further indicated that

2   Ward expressed a romantic interest with her.  (RT 568.)

3                                       DISCUSSION

4   A.     Jurisdiction

5          Relief by way of a petition for writ of habeas corpus extends to a person in custody

6   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

7   or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

8   529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

9   violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

10  out of the Tulare County Superior Court, which is located within the jurisdiction of this Court.

11  28 U.S.C. § 2254(a); 2241(d).

12         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

13  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

14  enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

15  F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

16  Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

17  1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

18  (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

19  petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

20  B.     Standard of Review

21         This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

22  custody pursuant to the judgment of a State court only on the ground that he is in custody in

23  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

24         The AEDPA altered the standard of review that a federal habeas court must apply with

25  respect to a state prisoner's claim that was adjudicated on the merits in state court.  Williams v.

26  Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

27  will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

28  to, or involved an unreasonable application of, clearly established Federal law, as determined by

                                              7

the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted).  "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.      Unanimity Instruction

Petitioner contends that the failure to instruct the jury with CALJIC No. 17.01, the unanimity instruction violated his due process rights.[3]

Petitioner presented this claim to the California Supreme Court by way of petition for review, which was summarily denied.  (Lodged Doc. Nos. 5, 6.)  In such circumstances, this

---

[3] The unanimity instruction, set forth in CALJIC No. 17.01 states:

The defendant is accused of having committed the crime of ____ [in Count ___].  The prosecution has introduced evidence for the purpose of showing that there is more than one [act][or][omission] upon which a conviction [on Count ___] may be based.  Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of the [acts] [or] [omissions].  However, in order to return a verdict of guilty [to Count ___], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [omissions].  It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict.

8

1   Court "looks through" that decision and presumes it adopted the reasoning of the California

2   Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker,

3   501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas

4   review, "look through" presumption that higher court agrees with lower court's reasoning where

5   former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7

6   (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining

7   whether state court's rejection of petitioner's claims was contrary to or an unreasonable

8   application of federal law under § 2254(d)(1)).

9        A challenge to a jury instruction solely as an error under state law does not state a claim

10  cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

11  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

12  ailing instruction by itself so infected the entire trial that the resulting conviction violates due

13  process.  See id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but

14  must be considered in the context of the instructions as a whole and the trial record. Id.  In order

15  to demonstrate actual prejudice from the error, a petitioner must show the error had a substantial

16  and injurious effect or influence in determining the jury's verdict, before this Court may grant

17  federal habeas relief.  Calderon v. Coleman, 525 U.S. 141, 146 (1998) (citing Brecht v.

18  Abrahamson, 507 U.S. 619, 637 (1993)).

19       A state trial court failure to give a particular jury instruction does not alone present a

20  cognizable claim in a section 2254 proceeding.  Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir.

21  1988).  Indeed, a petitioner's burden is especially heavy when a claim is based on the omission of

22  an instruction  because no erroneous instruction was given.  Henderson v. Kibbe, 431 U.S. 145,

23  155 (1977).  An omission, or an incomplete instruction, is less likely to be prejudicial than a

24  misstatement of the law.  Id.  The significance of the omitted instruction is evaluated by a

25  comparison with the instructions that were given.  Id. at 156; Murtishaw v. Woodford, 255 F.3d

26  926, 971 (9th Cir.2001).

27       In denying Petitioner's claim, the Court of Appeal held, in pertinent part, as follows:

28          [Petitioner] contends that the prosecution presented evidence of two
       distinct acts of "entry" for purposes of the crime of burglary, but did not elect

which of those two it was relying on to prove the burglary. According to [Petitioner], the trial court was required to instruct the jury that it must unanimously agree on which act constituted the burglary. [fn]

.................................................................................................................

Petitioner's argument in the instant case is that there were two distinct events which could have constituted the "entry" into the premises for purposes of the crime of burglary.

That is, one entry occurred at 7:30 p.m. on September 14, 2004, when the rock was thrown by [Petitioner] through the front window of the residence and [Petitioner] "pushed his hands right through" the window. As long as felonious intent was present, even this brief and minimal entry would be sufficient, technically, to constitute a burglary. [citations.] The second entry by [Petitioner] occurred sometime in the early morning hours of the next day, i.e., September 15, 2004, when the residence was ransacked. According to [Petitioner], since each entry could potentially constitute an act of burglary as long as the requisite intent was present, the unanimity instruction was required.

Additionally, [Petitioner] argues that when the prosecutor told the jury in closing argument, "So first degree residential burglary on September 14 and 15th of 2004," the prosecutor not only failed to elect which act constituted count 1, but actually encouraged the jurors to rely on either act.

The respondent counters that [Petitioner] is misconstruing the nature of the case that was presented and argued to the jury. We agree. The reason for the prosecutor's reference to burglary occurring on September 14th and 15th, 2004, is readily apparent from the circumstances. Neither Shook nor Anderson stayed at the residence that night. Shook testified she last saw [Petitioner] at the Blitz Bar at 11:30 p.m. or 12:00 midnight on the 14th. However, the ransacked residence was not discovered until the next morning, after [Petitioner's] 3:30 a.m. threatening telephone message. Thus, it was uncertain whether the burglary occurred entirely on September 15th, or in part during the waning minutes of September 14th. In count 1, the burglary was alleged to have occurred "[b]etween the 14th day of September, 2004 and the 15th day of September, 2004." The identical time frame is used to describe the felony vandalism charge in count 2. The reference to the 14th and 15th of September was obviously due to the uncertainty of the timing of the burglary, and no juror would take this to mean there were two events of burglary.

Moreover, the prosecutor's closing argument referred exclusively to the ransacking incident (inside the residence) as the burglary, with the 7:30 p.m. window-breaking incident mentioned only as a prelude thereto. [fn] In the course of her argument, the prosecutor emphasized the phone calls from [Petitioner] threatening damage to the house, especially the call at 3:30 a.m. on September 15th, to show his intention to go over to the house and demolish it if she doesn't do what he says. She reminded the jury: "You have those phone calls as proof of the [Petitioner's] intent, and the acts that he did when he got in there. You have proof of the photographs of what he did once he got in there." In summing up how the burglary and felony vandalism occurred, the prosecutor explained:

"You have defendant telling . . . Shook if you don't get home, in a nutshell, I'm going to vandalize your house. I'm going to go inside and mess your life up. That's what he did. ...

She [Brenda Shook] goes to the Blitz Bar at eleven.  She says she leaves by twelve.  She's not really sure of the time frame.  So obviously she didn't stay with him that night.  In fact, she stayed with her ex-husband that she's not really divorced from yet, I guess.  That couldn't have made him happy, especially after he had been trying to get a hold of her all day from three PM trying to get a ride from her, seven PM coming to her house not finding her, going to the bar.  She confronts him and she leaves.

So if she's gone by midnight and he's at the Blitz and Brenda testified herself that she can walk from the Blitz to her house, [Petitioner] walked from the Blitz to the house looking for Brenda, didn't find her there, and vandalized the house.  That's how it happened, folks."

Closing argument for the defense also focused exclusively on the later events (i.e., the entry and vandalism *inside* the residence) as the basis for the burglary charge.  [Petitioner's] attorney, in closing argument to the jury, responded that there is no evidence "that shows that Marty Allen crossed that threshold at 611 South Edison and had an intent in his mind to do felony vandalism."  He also argued there was no intent to commit felony vandalism (i.e., over $400 in damages) inside the residence because most of the items were merely turned over or messed up but not intentionally broken, and in any event the cost estimates for repair or replacement were not realistic or credible.  He went on to tell the jury "the burglary and the vandalism . . . go together," and "the whole issue is whether or not they've shown somebody [i.e., appellant] entered."  Anyone could have come in through that broken front window and caused damage inside, he argued, but the prosecutor has shown it was [Petitioner], and because of that "hat" later seen on Eric Ward, he suggested it may have been Mr. Ward who entered the residence that night.

In her rebuttal to the [Petitioner's] closing arguments, the prosecutor emphasized the following facts to establish that it was [Petitioner] who entered and did the damage: "[Petitioner]'s the one that's been calling here all night.  He's the one that's mad at Brenda.  *He's the one that broke out the window beforehand.*

Where CALJIC No. 17.01 is erroneously omitted, the reviewing court must determine whether the error was harmless beyond a reasonable doubt. [citations.] [fn.] Because the 7:30 p.m. incident could potentially constitute a burglary (assuming the requisite intent was found to be present), the trial court should have given the unanimity instruction.  However, we conclude that any error in this regard was harmless beyond a reasonable doubt.  In light of the manner in which the case was presented to the jury, and especially the closing arguments, there was no reasonable possibility that the jury believed the 7:30 p.m. incident. [citation.]  Accordingly, we conclude there was no reversible error.

(Lodged Doc. No. 4, Opinion, at 9-14.)

Respondent correctly points out that the instant claim is not cognizable in a federal

habeas action because the claim only implicates a violation of state law.  The Constitution does

not require unanimity in a jury verdict.  Apodaca v. Oregon, 404 U.S. 406, 410-413 (1972).

Thus, although Petitioner may have had a right to a unanimity instruction under California law,

Petitioner cannot demonstrate that the state appellate court's finding that any error was harmless

1   under the circumstances of the case to be contrary to or an unreasonable application of Federal

2   law.

3          In any event, as stated by the appellate court, even if the trial court erred by failing to give

4   the unanimity instruction, any error was harmless.  As found by the appellate court, although the

5   throwing of the rock and placement of hands through the window at 7:30 p.m. on September 14,

6   2004, could have technically constituted a burglary (assuming the requisite intent was found to

7   be present), a unanimity instruction should have appropriately been given.  However, reviewing

8   the entire record of this case and the context in which the case was presented to the jury, any

9   error was harmless.  As charged, the burglary was alleged to have occurred sometime between

10  September 14th and 15th, 2004.  The incident occurring on the 14th of September, was referenced

11  as a mere act leading up to the burglary which occurred on September 15, 2004.  The ransacked

12  residence was not discovered until the morning of September 15th, because no one stayed at the

13  residence that night.  As stated by the appellate court, the reference to the two dates was merely

14  due to the uncertainty as to the actual timing of the burglary, and no juror would have believed

15  there were two actual burglaries.  Furthermore, closing argument by both counsel emphasized

16  that the burglary occurred for the felonious purpose of vandalizing the residence as detailed in

17  Petitioner's telephone call at 3:30 a.m. on September 15th.  (See RT 608-649.)  Based on the

18  foregoing, the state court reasonably concluded that the failure to give a unanimity instruction did

19  not result in prejudice to Petitioner. See Brecht, 507 U.S. at 637.

20  D.    Insufficient Evidence In Support Of Burglary Conviction

21         Petitioner contends that there is insufficient evidence to support his conviction for

22  burglary because there was no evidence of a felonious purpose.

23         Petitioner presented this claim to the California Supreme Court, which summarily denied

24  the petition for review.  (Lodged Doc. No. 6.)  Accordingly, this Court "looks through" that

25  decision and presumes it adopted the reasoning of the California Court of Appeal.  Ylst v.

26  Nunnemaker, 501 U.S. at 804-05.

27         The law on insufficiency of the evidence claim is clearly established.  The United States

28  Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

1   federal court must determine whether, viewing the evidence and the inferences to be drawn from

2   it in the light most favorable to the prosecution, any rational trier of fact could find the essential

3   elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

4   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

5          The state appellate court found there was sufficient evidence to support Petitioner's

6   conviction for burglary, stating in relevant part:

> Penal Code section 459 states that every person who "enters any house ... with intent to commit grand or petit larceny or any felony is guilty of burglary." The specific intent necessary to commit burglary "is simply the felonious design with which the accused enters the building, i.e., 'with the intent to commit ... any felony' therein." (*People v. Smith* (1966) 63 Cal.2d 779, 793.)  Whether a defendant had the required felonious intent necessary to commit a burglary may be inferred from all of the facts and circumstances disclosed by the evidence. (*People v. Carter* (2005) 36 Cal.4th 1114, 1157.)
>
> [Petitioner] argues there was insufficient evidence to support the jury's verdict that he entered the residence with intent to commit felony vandalism therein.  We disagree.  Felony vandalism exists where the amount of damage or destruction to property is $400 or greater. (Pen. Code, §§ 594, subd. (b)(1).)  Felony vandalism is not a specific intent crime.  (*People v. Campbell* (1994) 23 Cal.App.4th 1488, 1493.)  The [Petitioner] need not have had a specific dollar value in his mind when he purposed to destroy things and wreck havoc in his girlfriend's residence.  His actions clearly evidenced an intent to commit significant property damage, of a nature which would obviously be costly to repair or replace, and in fact the total repair or replacement expenses greatly exceeded $400.[4]  His specific intent was properly inferred from such facts as his prior acts of vandalism, his angry telephone calls threatening destruction of property, and the level of actual destruction to the real and personal property.  We conclude there was substantial evidence to establish that [Petitioner] had a specific intent to commit felony vandalism within the residence. [Petitioner's] argument on this point is without merit.

7

8

9

10

11

12

13

14

15

16

17

18

19

20  (Lodged Doc. No. 4, Opinion, at 15-16.) (Footnote in original.)

21         Although the state appellate court did not explicitly cite the controlling Supreme Court

22  authority found in Jackson v. Virginia, 443 U.S. 307, 319 (1979), the court nonetheless cited and

23  relied on state law that is identical and not contrary to federal law.  See Early v. Packer, 537 U.S.

24  3, 8 (2002) (per curiam) (holding that a state court need not cite United States Supreme Court

25  cases so long as the state court's reasoning and result do not contradict Supreme Court

26  precedent.)

27

28  ⎯⎯⎯⎯⎯⎯⎯⎯⎯

[4] There was competent testimony from several witnesses to show damages of several thousands of dollars, ranging from approximately $3,000 or $4,000 to $14,000.

1   Petitioner's actions preceding the burglary, support the finding that he harbored a

2   felonious intent to commit felony vandalism at the time he entered the residence.  More

3   specifically, on September 14th, Petitioner telephoned Brenda at approximately three in the

4   afternoon asking for a ride, which she denied.  Out of anger Petitioner pulled the fuses out of her

5   car so it would not operate.  (RT 73.)  Then, at approximately 7:30 p.m. that evening, Petitioner

6   went to Brenda's home and while still visibly upset broke the windows out of the home, stating

7   "Brenda, you remember this is from Marty Allen." (RT 244-245, 249.)  He continued to call her

8   throughout the night, at one point telling her that she needed to get down to the Blitz bar in seven

9   minutes or he would drag her around like the whore she is.  (RT 280-281, SCT 3.)  The last

10  telephone call occurred at 3:30 a.m. on September 15th, in which Petitioner told Brenda that if she

11  did not go to the Blitz bar, she would not have any doors to go home to.  (RT 84-87.)

12  Petitioner's actions on the 14th and 15th, demonstrate his felonious intent to enter the dwelling for

13  the purpose of vandalism and were consistent with his prior acts of vandalism and threats

14  supporting an inference of a common plan or scheme on the day of the commitment offense.

15  Accordingly, because there was sufficient evidence that Petitioner harbored a felonious intent at

16  the time he committed the burglary, the state courts' determination of this issue was not contrary

17  to, or an unreasonable application of, clearly established Supreme Court precedent.

18  E.   Admission of Uncharged Offenses

19     Petitioner contends that the admission of uncharged offenses violated his due process

20  rights.

21     As with the prior two claims, Petitioner presented this claim to the California Supreme

22  Court, which summarily denied the petition for review.  (Lodged Doc. No. 6.)  Accordingly, this

23  Court "looks through" that decision and presumes it adopted the reasoning of the California

24  Court of Appeal.  Ylst v. Nunnemaker, 501 U.S. at 804-05.

25     The Court of Appeal properly summarized and analyzed Petitioner's claim finding it to be

26  without merit, stating:

27          In the present case, the prosecution made a pretrial motion to introduce
        evidence of other, uncharged misconduct.  The referenced misconduct included
28      (1) a December 2004 incident in which [Petitioner] made threatening calls to
        Shook's and Anderson's residence, shortly before Shook moved out, and (2) April

14

2005 incidents of harassment and vandalism at Shook's new residence.  The prosecutor argued the evidence showed a "pattern" of behavior.  That is, whenever Shook rebuffs him or tries to break up, he comes over, yells obscenities, harasses her, and it eventually escalates to vandalism.  The trial court agreed and granted the motion, concluding that the events of September 14th and 15th did not occur in a vacuum, and that the other incidents were "textbook" examples of evidence admissible under Evidence Code section 1101, subdivision (b) to prove identity, motive, or common plan or scheme.

At trial, the prosecution introduced the specific evidence of misconduct on the part of [Petitioner] occurring in December of 2004 and April of 2005.

We agree with respondent that the evidence of [Petitioner's] misconduct was properly admitted under Evidence Code section 1101, subdivision (b).  It was relevant evidence of [Petitioner's] identity in the burglary and felony vandalism. His identity as the perpetrator was in issue because he denied the charges, presented evidence of an alibi, and attempted to implicate another party (i.e., Eric Ward).  A pattern of abusive or intimidating behavior between the same perpetrator and victim, who were in a relationship with each other, is relevant to the issue of identity.  (*People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1613-1614.)  The evidence also tended to show the existence of a common plan or scheme-that is, when Shook did not do what [Petitioner] asked or if she tried to break off the relationship, he would revert to tactics of intimidation escalating from yelling obscenities in the middle of the night and making threats, to vandalism.  Such common features indicate a plan or scheme rather than a series of spontaneous acts.  (See *People v. Carter* (2005) 36 Cal.4th 1114, 1149 [common features with charged conduct should indicate "a plan rather than a series of spontaneous acts, but the plan thus revealed need not be distinctive or unusual"].)

We also agree with respondent that the evidence of other misconduct was admissible to show intent.  "The least degree of similarity (between the uncharged act and charged offense) is required in order to prove intent."  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)  The [Petitioner's] felonious intent at the time of the alleged burglary was an important issue in the case.  Evidence indicating he intended on other occasions to intimidate Shook through threats and vandalism is relevant to show that a similar intent, motive or state of mind was probably harbored on the day of the burglary. [citations.]

Thus, the [Petitioner's] contention the evidence of other misconduct was inadmissible is without merit.  Equally unavailing is the argument that the trial court abused its discretion under Evidence Code section 352.  The court could reasonably conclude the probative value outweighed any prejudicial effect, since it was significant evidence concerning issues such as identity, intent, and common plan or scheme. [Petitioner] has failed to demonstrate that the evidentiary ruling was arbitrary or capricious.

Finally, even if there was any error in admitting evidence of other misconduct, it was clearly harmless. [citations.] Here, the [Petitioner's] conviction of burglary and felony vandalism were based upon substantial evidence and the outcome was not a close call.  Additionally, the jury was duly instructed regarding the limited purpose for which such evidence could be considered.  Based upon the strength of the evidence presented at trial and the limiting instruction given to the jury, it is not reasonably probable that [Petitioner] would have obtained a more favorable result had the evidence of his other acts been excluded. [citation.]

1 (Lodged Doc. No. 4, Opinion, at 17-19.)

2       Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a

3 federal habeas corpus proceeding. Estelle, 112 S.Ct. at 477; Middleton v. Cupp, 768 F.2d 1083,

4 1085 (9th Cir.), cert. denied, 478 U.S. 1021 (1985).  Nevertheless, there can be habeas relief for

5 the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a

6 denial of due process. Estelle, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871,

7 874 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d

8 1180, 1192 (9th Cir. 1993), cert. denied, 510 U.S. 1191, 114 S.Ct. 1294 (1994); Gordon v. Duran,

9 895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state rules of evidence

10 alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process

11 grounds.  Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no

12 permissible inferences that the jury may draw from the evidence can its admission rise to the

13 level of a due process violation.  Id. at 920.  Intent is a permissible inference that the jury may

14 draw from the evidence of prior bad acts.  See Houston v. Roe, 177 F.3d 901, 910 n. 6 (9th Cir.

15 1999).

16       California Evidence Code Section 1101, subdivision (b), does not bar the admission of

17 evidence which is "relevant to prove some fact (such as motive, opportunity, intent, preparation,

18 plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to

19 commit such an act." Cal. Evid. Code § 1101(b).  However, under California law, evidence that

20 is admissible under section 1101, is subject to the restrictions imposed by California Evidence

21 Code section 352. Section 352, permits the trial judge to exclude evidence when its probative

22 value is substantially outweighed by its prejudicial effect.

23       Here Petitioner's previous acts of making threatening calls to Brenda's residence and

24 incidents of harassment and vandalism at her new residence, were clearly relevant to demonstrate

25 identity, motive, common plan or scheme.  This is particularly so, given Petitioner's denial of the

26 crime, presentation of an alibi, and implication of another party as the perpetrator.  The fact that

27 Petitioner had previously engaged in acts of intimidation toward Brenda was also relevant to

28 show identity.  In addition, the prior acts were relevant to show a common plan or scheme in that

16

1   whenever Brenda did not obey Petitioner's orders or would attempt to break off the relationship,

2   Petitioner would engage in acts of intimidation including going to her home, yelling obscenities,

3   and engaging in threatening phone calls.  Further, the appellate court reasonably found the prior

4   acts were relevant to prove Petitioner's intent, because the fact that he engaged in threats and

5   vandalism against Brenda on previous occasions demonstrated that he harbored a similar intent

6   on the day of the burglary.  Accordingly, because the prior acts evidence was properly admitted

7   to demonstrate something other than Petitioner's present disposition to engage in the same or

8   similar acts, the state courts' determination of this issue was not contrary to, or an unreasonable

9   application of, clearly established Supreme Court precedent.

10      Furthermore, the United States Supreme Court has not found that the admission of prior

11   conduct violates the Due Process Clause.  See Estelle, 502 U.S. at 75 & n.5 (declining to rule on

12   the constitutionality of propensity evidence); Alberni v. McDaniel, 458 F.3d 860, 864-867 (9th

13   Cir. 2006).  As such, because there is no clearly established federal law, the admission of the

14   evidence under California Evidence Code section 1101, cannot be said to have been contrary to

15   or an unreasonable application of federal law.

16                               ORDER

17      Based on the foregoing, it is HEREBY ORDERED that:

18   1.      The instant petition for writ of habeas corpus is DENIED;

19   2.      The Clerk of Court is directed to enter judgment in favor of Respondent; and,

20   3.      The court declines to issue a Certificate of Appealability.  28 U.S.C. § 2253(c);

21           Slack v. McDaniel, 529 U.S. 473, 484 (2000) (a COA should be granted where

22           the applicant has made "a substantial showing of the denial of a constitutional

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

right," i.e., when "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong"; <u>Hoffman v. Arave</u>, 455 F.3d 926, 943 (9th Cir. 2006) (same).  In the present case, the Court finds that reasonable jurists would not find it debatable that the state courts' decision denying Petitioner's petition for writ of habeas corpus were not "objectively unreasonable."


IT IS SO ORDERED.

**Dated:**   **October 4, 2008**                        **/s/ Dennis L. Beck**
                                                   UNITED STATES MAGISTRATE JUDGE